UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------
CARLOS FIGUEROA,

                        Plaintiff,              16-cv-00682 (JGK)

            - v.-                               MEMORANDUM OPINION
                                                AND ORDER
THE MINISTRY FOR FOREIGN AFFAIRS OF
SWEDEN ET AL.,

                        Defendants.
-----------------------------------

JOHN G. KOELTL, District Judge:

        The plaintiff, Carlos Figueroa, has brought claims for

personal injury, retaliation, and discrimination (due to his

national origin, race, and disability) arising from his

employment as an "Office Clerk/Chauffeur" with The Ministry of

Foreign Affairs of Sweden (the "Ministry"), and the Permanent

Mission of Sweden to the United Nations (the "Mission")

(collectively, "the defendants").[1] The plaintiff has also brought

a claim against the defendants for the alleged breach of a

separate tolling agreement. It is undisputed that the

defendants, as instrumentalities of the Kingdom of Sweden

("Sweden"), are foreign sovereigns under the Foreign Sovereign

Immunities Act (the "FSIA"). See 28 U.S.C. §§ 1602-11. Relying

---

[1] The plaintiff's discrimination claims are brought pursuant to the
New York City Human Rights Law. While the plaintiff also
initially brought two discrimination claims pursuant to New York
State law, the plaintiff abandoned those claims in his papers.
See Pl.'s Op. Mem. at 1 n.2.

on the FSIA's immunity provisions, the defendants have moved pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure to dismiss all of the plaintiff's claims, with the exception of the personal injury claim, for want of subject matter jurisdiction.[2]

The plaintiff initially brought this action in the New York State Supreme Court, New York County. The defendants removed the action to this Court pursuant to 28 U.S.C. §§ 1330 and 1441(d) because the Court has original jurisdiction over actions against foreign states.

For the following reasons, the defendants' motion for partial dismissal of the First Amended Complaint is **granted in part** and **denied in part**.

### I.

In defending a motion to dismiss for lack of subject matter jurisdiction, a plaintiff bears the burden of proving the Court's jurisdiction by a preponderance of the evidence. Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). When the defendant claims immunity under the FSIA and "presents a *prima facie* case that it is a foreign sovereign, the plaintiff

---

[2] Subject to certain exceptions, § 1605(a)(5) grants federal courts jurisdiction over foreign states for personal injury tort claims where the injury occurred in the United States. See Bisson v. United Nations, No. 06-cv-6352, 2007 WL 2154181, at *8 (S.D.N.Y. July 27, 2007), report and recommendation adopted, No. 06-cv-6352, 2008 WL 375094 (S.D.N.Y. Feb. 11, 2008).

has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted, although the ultimate burden of persuasion remains with the alleged foreign sovereign." Cargill Int'l S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1016 (2d Cir. 1993) (citations omitted). In considering such a motion, the Court generally must accept the material factual allegations in the complaint as true, but does not draw all reasonable inferences in the plaintiff's favor. See J.S. ex rel. N.S. v. Attica Cent. Sch., 386 F.3d 107, 110 (2d Cir. 2004); Graubart v. Jazz Images Inc., No. 02 Civ. 4645, 2006 WL 1140724, at *2 (S.D.N.Y. Apr. 27, 2006). Indeed, where jurisdictional facts are disputed, the Court has the power and the obligation to consider matters outside the pleadings, such as affidavits, documents, and testimony, to determine whether jurisdiction exists. See APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003); Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986). In doing so, the Court is guided by the body of decisional law that has developed under Rule 56 of the Federal Rules of Civil Procedure. Kamen, 791 F.2d at 1011; see also Hijazi v. Permanent Mission Of Saudi Arabia to the United Nations, 689 F. Supp. 2d 669, 670 (S.D.N.Y.), aff'd, 403 F. App'x 631 (2d Cir. 2010) (summary order).

## II.

The following facts are taken from the First Amended Complaint, and the declarations and affidavits accompanying the parties' respective motion papers.

The Ministry is a constituent part of the Government of Sweden responsible for Sweden's foreign affairs. FAC ¶ 3; Dahlin Aff. ¶ 6. The Ministry has no presence in the United States except through its instrumentalities: the Mission, the Swedish Consulate General, and the Swedish Embassy, all of which are located in New York State or Washington, D.C. Dahlin Aff. ¶ 6. The Mission, the Consulate General, and the Embassy each serve purely governmental functions designed to advance the national interests of Sweden. Dahlin Aff. ¶ 6.

The Mission represents Swedish diplomatic interests before the United Nations in New York City. Dahlin Aff. ¶ 5. The Swedish Ambassador to the United Nations is stationed at the Mission and has a residence in New York City. Dahlin Aff. ¶ 4. The Mission also supports around twenty Swedish diplomats. Dahlin Aff. ¶¶ 10-11. The Mission frequently hosts events, including for the diplomats of other nations. Dahlin Aff. ¶ 11. The Mission employs a variety of support staff, such as administrative assistants, secretaries, and human resources personnel. See, e.g., FAC ¶¶ 21, 24, 44.

4

In late 2005, the Mission advertised that it was seeking to hire an Office Clerk/Chauffeur. FAC, Ex. 3 (The Vacancy Announcement).[3] The Office Clerk/Chauffeur's duties included driving the Mission car "upon request," "minor repairs and maintenance," and other "routine clerical duties." FAC, Ex. 3. The Mission held itself out as an Equal Opportunity Employer, and did not require that an applicant speak Swedish. FAC, Ex. 3.

On January 9, 2006, the Mission hired the plaintiff, who is an American citizen of Puerto Rican descent and not fluent in Swedish, as the Office Clerk/Chauffeur, a position he currently holds. FAC ¶ 9; FAC, Ex. 1 (The Employment Letter). The plaintiff's employment with the Mission was governed by an employment agreement entitled the "Terms and Conditions for Locally Employed Staff." FAC, Ex. 2 (The Employment Agreement). The employment agreement provided, among other things, that the plaintiff's entitlement to a pension, group life insurance, and a funeral grant was subject to Swedish law for Locally Engaged Non-Swedish Staff at Swedish Missions Abroad. FAC, Ex. 2.

In his capacity as an Office Clerk/Chauffeur, the plaintiff spent the majority of his time chauffeuring the Swedish Ambassador and the Ambassador's family, Swedish diplomats and

---

[3] The vacancy announcement described the position as "Office Clerk/Driver," see FAC, Ex. 3, but the plaintiff's employment letter described the position as "Office Clerk/Chauffeur," see FAC, Ex. 1.

their families, and members of the Royal Family of Sweden. Dahlin Aff. ¶ 7; Figueroa Decl. ¶ 6. He also performed routine office tasks, such as setting up for the aforementioned events, accepting packages, and purchasing supplies. Figueroa Decl. ¶ 4; Dahlin Aff. ¶ 9.

The plaintiff alleges that, from the beginning of his employment, his Swedish employers treated him disparately and discriminated against him on a daily basis due to his race and national origin. FAC ¶ 32. The plaintiff catalogues numerous alleged acts of discrimination---ranging from demeaning slights to considerable career disadvantages---that he suffered as a result. For example, he alleges that the defendants excluded him from meetings, FAC ¶ 24; withheld multiple employment documents from him, FAC ¶¶ 19, 54; ordered him to perform personal tasks for Mission employees, FAC ¶¶ 18-19; attempted to reduce his compensation because he was not Swedish, FAC ¶ 30; failed to inform him of his entitlement to a clothing allowances (even though all Swedish employees knew about the allowance), FAC ¶ 32; and passed him over for promotion in favor of a more recently-hired Swedish employee with inferior qualifications, FAC ¶¶ 21-22.

Matters came to a head in May 2012, when the Swedish Ambassador allegedly directed the plaintiff to assemble and

install two very large pieces of furniture.[4] FAC ¶¶ 33-35. Over the plaintiff's protestations, the plaintiff alleges that the Ambassador directed him to assemble the furniture to avoid the cost of hiring professionals, even though the Ambassador knew that the assembly instructions stated that two workers with requisite carpentry competence should construct the wardrobe. FAC ¶¶ 35-39. While assembling the furniture, the plaintiff alleges that he fell from a ladder, leading to serious injuries to his back and legs that form the basis for the plaintiff's personal injury claim, which is not at issue on this motion. FAC ¶ 40.

The plaintiff's injuries have required extensive medical treatment and resulted in two medical leaves from work, the latter of which has extended from May 24, 2014, through the present. FAC ¶ 42. During his medical leaves, the plaintiff alleges that the defendants have threatened to fire him unless he prematurely returns to work, which he is allegedly incapable of doing due to his severe injuries. FAC ¶¶ 47, 50. The actions that the defendants have taken to push the plaintiff out of his position at the Mission form the basis for the plaintiff's retaliation and disability discrimination claims.

---

[4] The furniture consisted of two heavy wardrobes purchased from IKEA.

Following his injuries, the plaintiff became eligible for, and received, medical leave compensation at the rate of 80% of his salary pursuant to his employment agreement. FAC ¶ 51. On May 22, 2015, after the plaintiff informed the defendants of the possibility of litigation, the parties entered into a tolling agreement that preserved all of the parties' claims and defenses, and provided that the defendants' counsel would accept service of process. See Chinitz Decl. ¶ 2; Chinitz Decl., Ex. 1 (The Tolling Agreement). The tolling agreement imposed a number of other obligations on the parties, including that the plaintiff would keep his claims confidential during settlement negotiations. Chinitz Decl., Ex. 1.

In addition, the tolling agreement provided that, "To enable [the defendants] to fully evaluate [the plaintiff's] claims, including those claims related to his physical injuries, and to enable the Parties to attempt to negotiate a confidential settlement of [the plaintiff's] claims, all of which are denied by [the defendants], [the plaintiff] will continue to remain on a partially paid leave of absence at the same level of compensation as presently being received (something to which [the defendants] take[] the position that he is not entitled to at this time)." Chinitz Decl., Ex. 1. Despite the tolling agreement, the plaintiff alleges that the Mission reduced the plaintiff's medical leave compensation. FAC ¶¶ 52, 87-89.

8

### III.

The only basis for subject matter jurisdiction in this Court over a foreign sovereign is the FSIA. See Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 610-11 (1992). Under the FSIA, a foreign sovereign is immune from suit in the United States unless a statutory exception applies. See 28 U.S.C. § 1604 ("[A] foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."); Weltover, 504 U.S. at 610-11. "The FSIA defines 'foreign state' to include an 'agency or instrumentality' of a foreign state." Kato v. Ishihara, 360 F.3d 106, 110 (2d Cir. 2004) (quoting 28 U.S.C. § 1603(a)). There is no dispute that the defendants are foreign sovereigns under the FSIA.

The plaintiff argues that the Court has jurisdiction over the plaintiff's claims for discrimination, retaliation, and breach of contract pursuant to 28 U.S.C. § 1605(a)(2), the commercial activity exception of the FSIA. Under § 1605(a)(2), as relevant here, a foreign sovereign is not immune from suit in any case "in which the action is based upon a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(2). The FSIA defines a "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial

9

character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d).

The FSIA's legislative history indicates that Congress intended the FSIA to give "courts . . . a great deal of latitude in determining what is a 'commercial activity' for purposes of [the FSIA]." Kato, 360 F.3d at 110 (alterations in original) (quoting H.R. Rep. No. 94-1487, at 16 (1976), as reprinted in 1976 U.S.C.C.A.N. 6604, 6615). The same legislative history gives examples of what Congress considered to be governmental, as opposed to commercial, activity. See id. (governmental activity includes "the employment of diplomatic, civil service, or military personnel" while commercial activity includes "employment or engagement of laborers, clerical staff or public relations or marketing agents") (quoting H.R. Rep. No. 94-1487, at 16).

"[A] state engages in commercial activity . . . where it exercises only those powers that can also be exercised by private citizens." Saudi Arabia v. Nelson, 507 U.S. 349, 360 (1993) (quoting Weltover, 504 U.S. at 614). "[T]o determine the nature of a sovereign's act, we ask not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives but rather

10

whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek, 600 F.3d 171, 177 (2d Cir. 2010) (quoting Weltover, 504 U.S. at 614).

To determine whether the commercial activity exception applies, the Supreme Court recently reiterated that the "'based upon' inquiry . . . first requires a court to identify the 'particular' conduct on which the plaintiff's action is 'based.'" OBB Personenverkehr AG v. Sachs, 136 S. Ct. 390, 395 (2015) (alterations and citation omitted); see also Kensington Int'l Ltd. v. Itoua, 505 F.3d 147, 154-55 (2d Cir. 2007) (noting that the same definition of "based upon" is applicable to all three clauses of the commercial activity exception). A court must thus "examin[e] the act of the foreign sovereign that serves as the basis for the plaintiff's claim," Anglo-Iberia, 600 F.3d at 177, meaning that a court must focus on "the gravamen of the complaint" and "those elements that if proven would entitle a plaintiff to relief," OBB Personenverkehr, 136 S. Ct. at 395 (citation and alteration omitted).

### A.

The plaintiff's retaliation and discrimination claims are plainly based upon the plaintiff's employment relationship with

the defendants. While the plaintiff argues that the inquiry should focus on the specific discriminatory and retaliatory acts that form the basis for his claims, that approach presents the issue too narrowly for purposes of assessing commercial activity. Indeed, the courts of appeals have uniformly rejected the plaintiff's suggested analytical framework in employment cases. See El-Hadad v. United Arab Emirates, 496 F.3d 658, 663 n.1 (D.C. Cir. 2007) (noting, that like all courts of appeals, including the Court of Appeals for the Second Circuit, "[the Court of Appeals for the D.C. Circuit] . . . focus[es] [its] commercial activity analysis on the employment relationship between [the plaintiff] and the [defendant-embassy] as a whole, rather than narrowly on [the plaintiff's] termination alone or separately on [the plaintiff's] termination and defamation" (citing Kato, 360 F.3d at 111-12)). With respect to the retaliation and discrimination claims, the gravamen of the complaint is that, over the course of the plaintiff's employment, the defendants discriminated and retaliated against the plaintiff due to his race, national origin, and disability. Accordingly, the commercial activity exception can only apply to those claims if the employment relationship between the defendants and the plaintiff was commercial in nature.

The plaintiff argues that his employment as an Office Clerk/Chauffeur was in fact commercial in nature and unrelated

to the defendants' diplomatic activity in the United States. The defendants respond that the plaintiff's employment was non-commercial because the Mission is uniquely sovereign and employment with the defendants is not the type of activity in which a private party could engage.

Although the courts of appeals agree that the employment relationship is the proper starting point for the commercial activity exception inquiry, the courts of appeals apply different analytical approaches to assess whether the employment relationship qualifies as commercial. See id. at 664 n.2 (reviewing different approaches). While the plaintiff argues that the (more favorable) analytical approaches used in other circuits should apply to this case, the standard set forth by the Court of Appeals for the Second Circuit is controlling.

Kato v. Ishihara, 360 F.3d 106 (2d Cir. 2004), is the Court of Appeals' most recent decision extensively analyzing the application of the commercial activity exception to employment relationships. In that case, the plaintiff, a Japanese citizen employed by the Tokyo Metropolitan Government ("TMG") in Japan, brought sexual harassment, retaliation, and discrimination claims against TMG based upon acts that occurred while she was assigned to TMG's New York office. Id. at 107, 109. The plaintiff was employed under the terms of Japanese laws governing "local public servants." Id. at 109.

13

The plaintiff argued that TMG's function promoting business development and investment on behalf of Japanese businesses rendered TMG's activities commercial. Id. at 108, 111-12. The plaintiff also argued that her job responsibilities---including preparing marketing reports and promoting products at trade booths---at the very least rendered her own employment commercial in nature. Id. at 109. Indeed, the plaintiff pointed to the legislative history of the FSIA, which stated that a foreign sovereign's "employment or engagement of laborers, clerical staff or public relations or marketing agents" is to be considered commercial activity. Id. at 110 (quoting H.R. Rep. No. 94-1487, at 16) (emphasis added). The defendant countered that the plaintiff was a public servant under the laws of Japan, and that the FSIA's legislative history stated that the hiring of a civil servant would be typically non-commercial in nature. Id. at 111.

The Court of Appeals rejected the plaintiff's argument that the inclusion of "marketing agent" in the legislative history as an example of a commercial activity could be conclusive in that case. Id. As the Court of Appeals noted, even though the plaintiff was a marketing agent, she was governed by Japan's public service laws and, far more significantly, she was integral to the mission of TMG: marketing Japanese businesses. Id. Thus, "[I]n order to evaluate plaintiff's argument that her

14

employment was by nature 'commercial' because she engaged in 'commercial activity' on behalf of TMG, [the Court] consider[ed] whether TMG's activities in New York were typical of a private party engaged in commerce." Id. The Court found that the actions performed by TMG---actions that would naturally require the employment of marketing agents, like the plaintiff---"were only superficially similar to actions typically undertaken by private parties" because they were actually geared toward "the promotion of other Japanese businesses, or the promotion of Japanese business interests in general," a type of activity appropriately undertaken by a foreign sovereign, not a private business. Id. at 111-12. Accordingly, because "TMG was not involved in a 'commercial activity' under the FSIA when it provided general business development . . . to Japanese businesses," the Court "reject[ed] plaintiff's argument that her involvement in [promoting] such activities on TMG's behalf rendered her employment 'commercial' under the FSIA." Id. at 112. The Court of Appeals concluded that there was no jurisdiction over the plaintiff's claims. Id. at 114.

The Court of Appeals also emphasized that any assessment of an employee's status as a civil servant must not be in reference to the norms associated with civil service in the United States; instead, such an inquiry should focus on the contemporary norms associated with civil service in the sovereign country at issue.

15

Id. at 112 ("[W]here courts identify 'governmental' or 'non-commercial' activity by reference to the category 'civil service' identified by the House Report of the FSIA, the category of 'civil service' should be interpreted to include the broad range of civil service employment relationships used by countries other than the United States.").

As the Court's analysis demonstrated, the examples of non-commercial and commercial employment contained in the FSIA's legislative history could clash: it was possible for a marketing agent also to be a civil servant. It would thus be inappropriate for a court to rely on the examples set forth in the legislative history as outcome determinative without further analysis. See id. at 114 ("In determining whether a foreign government's employment of personnel in the United States is 'civil service,' and therefore 'governmental,' we do not look principally to whether that employment resembles the *contemporary civil service of the American democracy*, but we instead inquire whether the particular actions that the foreign state performs . . . are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" (citation omitted) (first emphasis added)).

The parties dispute the proper interpretation of Kato. The defendants argue that the focus should be on the defendants' activities alone. The plaintiff argues that the focus should be

16

primarily on the plaintiff's job activities irrespective of the sovereign's general activities. In Hijazi v. Permanent Mission Of Saudi Arabia to the United Nations, 689 F. Supp. 2d 669, 670 (S.D.N.Y.), aff'd, 403 F. App'x 631 (2d Cir. 2010) (summary order), this Court read Kato to require two inquires in employment cases: First, "whether the activity to which the plaintiff's employment was directed is governmental"; and, second, "whether the plaintiff's employment relationship was sufficiently intertwined with that activity to provide that the employment relationship itself was part of the governmental function." Id. at 674-75. The dual inquiry is faithful to Kato. In Kato, the Court of Appeals analyzed the job responsibilities of the plaintiff, determining that those responsibilities were inextricably intertwined with the function of TMG to promote Japanese commerce.

In Hijazi, 689 F. Supp. 2d at 670, an employee of the Kingdom of Saudi Arabia's Mission to the United States sued the Saudi Mission based on a variety of discrimination claims. Under the first Kato inquiry, the Saudi Mission was plainly engaged in governmental activity. Id. at 674-75.

As to the second Kato inquiry, the Saudi Mission presented uncontested evidence that the plaintiff held the rank of an "Advisor," the classification for the Saudi Mission's highest ranked employees who were not career diplomats. Id. at 675. The

plaintiff performed significant duties on behalf of the Saudi Mission, including "attending meetings, both alone and in the company of diplomats, conducting research, and writing memoranda," and even speaking on behalf of the Saudi Government at the United Nations. Id. at 671, 675. While this Court noted that, based on Kato's interpretation of the FSIA's legislative history, "it would be clear that hiring purely clerical staff, even clerical staff that types diplomatic speeches, comes within the commercial activity exception," the plaintiff was much more than a clerical worker. Id. at 675. The plaintiff's employment was integral to the diplomatic function of the Mission, and accordingly the plaintiff's employment relationship with the Saudi Mission was governmental, not commercial in nature. Id.

In this case, under the first Kato inquiry, the activity to which the plaintiff's employment was directed is undoubtedly governmental. See id. at 674; Gray v. Permanent Mission of People's Republic of Congo to United Nations, 443 F. Supp. 816, 820 (S.D.N.Y.) ("[I]t is hard to imagine a purer embodiment of a foreign state than that state's permanent mission to the United Nations."), aff'd, 580 F.2d 1044 (2d Cir. 1978).

The defendants argue that the analysis should stop there, and that the second Kato inquiry is no longer necessary in light of Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek, 600 F.3d 171 (2d Cir. 2010), a decision issued shortly after this Court's

decision in Hijazi. Based on their interpretation of Anglo-Iberia, the defendants also argue that the legislative history of the FSIA has been rendered a nullity in employment cases. The defendants advocate the application of a *per se* rule that *any employee* of the Mission (or similar foreign sovereign organ operating in the United States) cannot be employed in a commercial capacity. But the defendants overstate the relevance of Anglo-Iberia to an individual employee's claims against a sovereign employer *based upon* an employment relationship.

In Anglo-Iberia, the plaintiffs sued the Republic of Indonesia, and the Indonesian state-owned social security insurer, Jamsostek, for alleged negligent supervision over Jamsostek's employees, who had allegedly perpetrated an international commercial reinsurance fraud scheme that injured the plaintiffs. Id. at 174. The gravamen of the plaintiffs' claim was not based on the employment relationship between Jamsostek and its employees; rather, it was based upon Jamsostek's provision of health insurance as Indonesia's "default health insurer," a quintessential sovereign function that a private health insurer would not perform. Id. at 177-78. The Court observed that "to hold otherwise and look *only* to the fact of employment for purposes of our 'commercial activity' analysis would allow the exception to swallow the rule of

presumptive sovereign immunity codified in the FSIA." Id. at 178 (emphasis added).

Anglo-Iberia is relevant to the first Kato inquiry in this case. Regardless of the various employees that the defendants employed, the defendants were still undoubtedly engaged, as a general matter, in a governmental function: representing Swedish foreign interests. Anglo-Iberia has much less relevance for the second Kato inquiry, namely when an employee sues a sovereign, what is the relationship between the employee's employment and the sovereign's governmental function.[5]

The conclusion that the second inquiry should be performed based on a fair reading of Kato is buttressed by the summary order affirming Hijazi, which the Court of Appeals issued following Anglo-Iberia. See Hijazi v. Permanent Mission of Saudi Arabia to United Nations, 403 F. App'x 631, 632 (2d Cir. 2010) (summary order). Much like the dispute between the parties in this case, on appeal in Hijazi, the plaintiff argued that a court should focus only on the employee's activities, while the

---

[5] The defendants also argue that Kato rejected any application of the legislative history to employment cases. But, as noted, Kato only rejected assessments of the legislative history that relied upon American norms of civil service, as opposed to the norms of the sovereign at issue. See Kato, 360 F.3d at 114 n.6 (rejecting approach to legislative history taken by Holden v. Canadian Consulate, 92 F.3d 918, 921 (9th Cir. 1996), and Mukaddam v. Permanent Mission of Saudi Arabia to United Nations, 111 F. Supp. 2d 457, 463 (S.D.N.Y. 2000), that relied upon "certain familiar indicia" relevant to the American conception of civil service).

Saudi Mission countered that a court should focus only on the sovereign's activities. See id. The Court of Appeals did not need to resolve the dispute because it could "affirm under either formulation of the jurisdictional inquiry." Id. The Court of Appeals did not reject the relevance of either the activities of the sovereign, or the activities of the employee.[6] See id.

Accordingly, under Kato, it is appropriate to analyze whether the plaintiff's employment relationship was sufficiently intertwined with the defendants' governmental activity to provide that the employment relationship itself was part of the governmental function. In this case, the plaintiff's transportation responsibilities as a chauffeur at the Mission were sufficiently intertwined with the diplomatic function of the Mission such that the employment itself was part of the defendants' sovereign function.

In his capacity as a chauffeur, the plaintiff was responsible for transporting the Swedish Ambassador and the

---

[6] The defendants argue that the analysis employed in Kim v. Korea Trade Promotion-Inv. Agency, 51 F. Supp. 3d 279 (S.D.N.Y. 2014) ---which focused primarily on the activities of the sovereign--- supports their articulation of the law, but Kim was essentially a carbon copy of Kato and thus does not add much to the proper interpretation of Kato in other employment cases. See Kim, 51 F. Supp. 3d at 286-87 (describing the facts at issue as "strikingly similar" and "almost identical" to those in Kato). Moreover, Kim found that, "Plaintiff's function was not ancillary to [the defendant's] promotion of Korean firms; rather, Plaintiff actively worked to facilitate that quintessentially governmental goal." Id. at 289 n.4.

Ambassador's family, Swedish diplomats and their families, and even members of the Royal Family of Sweden. See FAC ¶ 43 (noting the Ambassador's "schedule sometimes required that [the plaintiff] sit in the Embassy car for up to eighteen hours at a time" in order to aid the Ambassador); Dahlin Aff. ¶¶ 7-8 (stating that the plaintiff spent approximately 80% of his time as a chauffeur). The defendants' employment of the plaintiff as a full-time chauffeur for the Mission entrusted the plaintiff with the safe transport of Swedish dignitaries, an activity integral to effecting the governmental function of the Mission. A sovereign's decisions on how best to address the safety concerns of government officials are peculiarly sovereign because the failure to protect or safeguard a sovereign representative, such as an ambassador or a titular head of state, can have extremely adverse consequences for the sovereign nation. See Butters v. Vance Int'l, Inc., 225 F.3d 462, 465 (4th Cir. 2000) (reasoning that a "foreign sovereign's decision as to how best to secure the safety of its leaders" is an "act peculiar to sovereigns" and thus holding that employing security guards was a non-commercial activity). The plaintiff's employment relationship was non-commercial because it was sufficiently intertwined with the defendants' governmental function.

In an essentially identical case, Crum v. Kingdom of Saudi Arabia, No. CIV.A. 05-275, 2005 WL 3752271, at *4 (E.D. Va. July 13, 2005), the United States District Court for the Eastern District of Virginia likewise concluded that an embassy's employment of a full-time limousine driver was not subject to the commercial activity exception. Relying on Kato's reasoning, the court in Crum held that, "An embassy's decision to hire a limousine driver to transport embassy officials, their families and guests, and meet its everyday needs does not amount to engaging in 'trade and traffic or commerce.'" Id. (citation omitted); see also El-Hadad, 496 F.3d at 664 n.2 (citing Crum with approval).

The plaintiff contends that the inquiry should focus on the plaintiff's duties as an office clerk. But the record shows that the plaintiff spent most of his time as a chauffeur. In any event, there is no basis to segregate the portions of the plaintiff's employment that could be characterized as purely clerical from the portions that were more in aid of the defendants' governmental function because the commercial activity jurisdictional assessment must be made with reference to the plaintiff's course of conduct with the defendants as a whole, which was non-commercial in nature. See Hijazi, 689 F. Supp. 2d at 675 (finding that even though some of the employee's duties may have been clerical, the employee's duties on the

whole were intertwined with the defendant's governmental
function).

The plaintiff also argues that, in light of the FSIA's
legislative history, his duties as a chauffeur were closer to
those of a laborer or a clerical worker than to those of a civil
servant. Although the examples of commercial employment in the
legislative history are informative, they are not outcome
determinative. See Kato, 360 F.3d at 113. Moreover, reference to
the employment examples in the legislative history must be
measured by the norms of the sovereign at issue, in this case,
Sweden. The plaintiff's employment agreement was subject to a
special body of statutory law for "Locally Engaged Non-Swedish
Staff at Swedish Missions Abroad." See FAC, Ex. 2. The body of
law is specific to Swedish Missions, and does not apply to any
employee of a private Swedish company. While similarly not
outcome determinative, the existence of a Swedish statutory
scheme for the Mission's employees weighs in support of the
conclusion that the plaintiff's employment was intertwined with
the governmental function of the Mission. See Kato, 360 F.3d at
109; Hijazi, 689 F. Supp. 2d at 671. This is true even though
the plaintiff may not have been a civil servant under Swedish
law because "[o]ther countries are free to structure employment
relationships in ways that do not mimic civil service
protections now common to the United States and many European

24

states, without thereby sacrificing the immunity conferred by the FSIA, as long as the sovereign, by extending the employment, is engaging in 'governmental' rather than 'commercial' activity." Kato, 360 F.3d at 113; cf. El-Hadad, 496 F.3d at 664 & n.2 (holding that the employment of some non-civil servants can properly be characterized as non-commercial). Under Kato, the plaintiff's employment was non-commercial because the defendants were engaged in a governmental function, and the plaintiff's employment was intertwined with that function such that it too should be properly considered governmental.

Finally, the plaintiff argues that a finding that his employment was governmental would mean that the defendants could enter into any basic commercial transaction and retain their immunity. The plaintiff's slippery slope argument is unpersuasive. The first step in any commercial activity exception inquiry is identifying the conduct or transaction that provides the basis for the gravamen of a plaintiff's claim. With respect to the retaliation and discrimination claims, the plaintiff's claims are "based upon" his employment, which was not commercial in nature. By contrast, as the defendants concede, claims "based upon" individual service transactions with third-parties---such as individual taxi, food, and delivery services---would be "obviously" subject to the commercial activity exception. See Defs.' Reply Mem. at 4. As discussed

below with respect to the plaintiff's claim that the defendants breached the tolling agreement, the defendants can certainly enter into transactions that are subject to the commercial activity exception.[7]

**B.**

The plaintiff's claim that the defendants breached the tolling agreement by reducing the plaintiff's medical leave compensation---allegedly in contravention of the tolling agreement's provision that the defendants would maintain that compensation at the same level while the parties explored a confidential settlement, see Chinitz Decl., Ex. 1---is different from the plaintiff's retaliation and discrimination claims. The tolling agreement is a contract, and the plaintiff's claim is "based upon" the defendants' alleged breach of that contract. See OBB Personenverkehr, 136 S. Ct. at 395. The defendants do not contest that the tolling agreement is a valid contract, and, furthermore, concede that the defendants can enter into contracts that are commercial in nature. See, e.g., Weltover, 504 U.S. at 614-15 ("[A] contract to buy army boots or even bullets is a 'commercial' activity, because private companies can similarly use sales contracts to acquire goods."); U.S. Fid.

---

[7] The defendants also moved to dismiss the discrimination claims on other grounds, but it is unnecessary to reach the alternative arguments for dismissal because the defendants are immune from suit on those claims.

& Guar. Co. v. Braspetro Oil, 379 F. Supp. 2d 487, 490 (S.D.N.Y. 2005).

Nevertheless, the defendants assert that the tolling agreement is inextricably intertwined with the underlying employment claims for discrimination and retaliation, and thus was not the product of a commercial activity. In particular, the defendants argue that the breach of contract claim is an attempt to recast the retaliation claim in contract clothing so that the claim better fits the commercial activity exception.

However, the plaintiff's claim is not that the defendants breached the underlying employment agreement by reducing his leave benefits, but that the defendants breached their obligations as set forth in a new contract wholly separate and apart from the underlying employment agreement. A tolling agreement creates enforceable rights between parties, and is the type of contract that private parties regularly enter into to freeze their respective rights in contemplation of future litigation. See, e.g., Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co., 81 F. Supp. 3d 1, 15 (D.D.C. 2015); Medtronic Navigation, Inc. v. Saint Louis Univ., No. 12-cv-01706-PAB, 2013 WL 5323307, at *4 (D. Colo. Sept. 23, 2013). In this case, among other things, the parties agreed that the plaintiff would keep his claims confidential, and, in exchange, the defendants would

maintain his leave compensation. The tolling agreement is plainly not the product of an act peculiar to a sovereign.

In an analogous case involving a sovereign's alleged breach of a settlement agreement, the Court of Appeals for the Fifth Circuit reasoned that, "The negotiation of contracts, including entry into a settlement agreement, clearly is the type of act performed by private persons." United States v. Moats, 961 F.2d 1198, 1205 (5th Cir. 1992). There, the Court of Appeals held that any jurisdictional inquiry under the commercial activity exception must focus on the settlement agreement that the sovereign allegedly breached. Id. at 1205-06. Accordingly, the underlying activities and claims resolved by the settlement agreement were irrelevant to the jurisdictional inquiry. Id. As the Court of Appeals concluded, the settlement "agreement functioned as a new contract between the parties, and [the plaintiff] now wants to recover for an alleged breach of that new contract," meaning that the settlement agreement was the activity that had to support jurisdiction under the commercial activity exception. Id. at 1206. In that case, although the entry into the settlement agreement was a commercial activity, the commercial activity exception did not apply because the settlement agreement had no jurisdictional connection to the United States. See id.

28

In this case, there is no jurisdictional connection issue. The defendants entered into a contract just like any private party, and the commercial activity exception applies to a claim based upon the breach of that contract. A contrary conclusion would mean that a sovereign's agreement to toll a statute of limitations---the archetypal provision of a tolling agreement, including the one at issue---would be *unenforceable* by courts in the United States. It is irrelevant that the plaintiff's underlying employment relationship with the defendants was non-commercial in nature because the tolling agreement was a distinct transaction that is commercial in nature.

Accordingly, this Court has jurisdiction over the plaintiff's claim for breach of contract pursuant to 28 U.S.C. § 1605(a)(2).

## CONCLUSION

This Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the foregoing reasons, the defendants' motion for partial dismissal of the First Amended Complaint for lack of subject matter jurisdiction is **granted** with respect to the discrimination and retaliation claims, and **denied** with respect to the breach of contract claim. The Clerk is directed to close Dkt. No. 32.

**SO ORDERED.**

Dated:     New York, New York
           November 26, 2016          _____/s/_____
                                           John G. Koeltl
                                      United States District Judge

30