UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

CARLOS FIGUEROA,                          16-cv-682

                    Plaintiff,            MEMORANDUM OPINION AND
                                          ORDER
        v.

THE MINISTRY FOR FOREIGN AFFAIRS OF
SWEDEN and SWEDEN'S NEW YORK MISSION
TO THE UNITED NATIONS,

                    Defendants.
_____

JOHN G. KOELTL, District Judge:

        The plaintiff, Carlos Figueroa, sued his former employer

The Ministry for Foreign Affairs of Sweden (the "Ministry") and

the Permanent Mission of Sweden to the United Nations (the

"Mission"). The plaintiff claims that he was injured while

putting together a wardrobe on his employer's premises where, in

an alleged accident that was witnessed by no one else, he fell

backwards from a ladder.

        This Court has jurisdiction over the action pursuant to 28

U.S.C. § 1330(a) and the Foreign Sovereign Immunities Act, 28

U.S.C. § 1605(a)(5) ("FSIA"). The law to be applied is the

common law of New York. See Robinson v. Government of Malaysia,

269 F.3d 133, 142 (2d Cir. 2001). The Court held a nine day

non-jury trial.  Having reviewed the evidence and assessed the

credibility of the witnesses, the Court now makes the following findings of fact and reaches the following conclusions of law.

## I. FINDINGS OF FACT

1.    The plaintiff, Carlos Figueroa, began working for the Mission in the position of Office Clerk/Chauffeur on January 11, 2006. Def. Ex. 650 at PMOS 0001553. The Mission vacancy for which Mr. Figueroa applied described the job duties for this position as including driving the ambassador, handling deliveries, routine clerical duties, and minor repairs and maintenance. Def. Ex. 616. Mr. Figueroa also described his job duties in declarations he submitted to the Court on February 16, 2016, Def. Ex. 617 at 2-3, and June 27, 2016, Def. Ex. 618 at 2-3, as including moving boxes; setting up and breaking down table and chairs in conference rooms; moving other furniture; acting as a messenger; fixing and maintaining fax machines, copiers, dishwashers and printers; changing light bulbs; assembling and repairing furniture; hanging pictures and shelves and bulletin boards, Trial Tr. ("Tr.") 331-332.

2.    As Office Clerk/Chauffeur, one of the plaintiff's principal job duties was to drive the Permanent Representative of Sweden to the United Nations (the "Ambassador") on official business, or to drive other dignitaries or visitors doing business with the Mission as needed. Def. Ex. 650 at PMOS 0001576. During the course of the plaintiff's employment with

2

the Mission, he received regular pay increases on an annual basis, including while on medical leave of absence. Def. Ex. 650 at PMOS 0001593; Tr. 762-763.

### A. The Order and Delivery of the IKEA Wardrobe

3.    In or around late May-June 2012, the residence of the Ambassador was moved from 117 East 64th Street, New York, New York to 600 Park Avenue, New York, New York (the "Residence"). Tr. 834; Pl. Ex. 81. In connection with that move, Ambassador Marten Grunditz and his family required additional storage space at the new 600 Park Avenue address. Tr. 777. To accommodate that need, in May 2012, the Mission purchased from IKEA certain furniture, including a PAX Anstad wardrobe (the "Wardrobe") with sliding doors. Tr. 777; Pl. Ex. 63. This purchase was approved by the Swedish Government. Tr. 777.

4.    The plaintiff met with the Head of Chancery, Asa Zinfandel, who asked the plaintiff to pick up the furniture from an IKEA store. Tr. 114. The plaintiff responded that the PAX wardrobe was too big for one person to purchase and transport alone. Tr. 339-340. In response, Ms. Zinfandel ordered the furniture from IKEA and arranged for it to be delivered to the Residence. Tr. 117; 340; see also Pl. Ex. 63, where Selim Adira, the house manager for the Ambassador, received the delivery, Tr. 836, on or about May 17, 2012, Pl. Ex. 63.

## B. Assembly of the Wardrobe

5.   The plaintiff was also asked to assemble the Wardrobe,
and the plaintiff told Ms. Zinfandel and the Ambassador that two
people would be required to assemble the Wardrobe. Tr. 117,
339-340. The Ambassador told the plaintiff that a second person
would work with the plaintiff. Def. Ex. 623 (Dkt. No. 25) ¶ 35;
Tr. 340.

6.   The plaintiff's claim that the Mission did not
actually assign anyone to assist him to assemble the Wardrobe is
not credible. It is belied by his own email, sent to the
Ambassador's assistant, Christina Tillander, on May 22, 2012,
stating: "salim wants me to help with the furniture tomorrow at
10am." Def. Ex. 628. Anneli Bailey also sent an email on May 21,
2012 confirming that Mr. Adira and the plaintiff were expected
to be at the Residence together, which read, in pertinent part,
(in Swedish): "FYI I will be hanging the draperies on Wednesday
morning when Carlos, together with Selim, will be at 600 Park."
Def. Ex. 642; Tr. 807.

7.   The plaintiff's claim that he, in fact, assembled the
Wardrobe entirely on his own is equally unsupported by the
evidence. First, Selim Adira testified credibly that he
participated in the assembly of the Wardrobe, Tr. 837, including
the assembly of the Wardrobe's doors, Tr. 840. Mr. Adira's
participation in the assembly with Mr. Figueroa spanned over the

course of parts of May 23, 24, and 25, 2012. Tr. 840-841. While Mr. Adira also had responsibility to supervise movers, Mr. Adira testified credibly that he also assisted in the assembly of the Wardrobe over those three days. Tr. 840-841. It is also clear that Mr. Adira was not engaged exclusively in supervising the movers over those three days. Indeed, he brought the plaintiff lunch on Friday, May 25, the Friday before the Memorial Day weekend. Mr. Adira's testimony is supported by the testimony of Ms. Bailey, who credibly testified that she witnessed Mr. Adira together with the plaintiff in the third floor master bedroom opening boxes and taking out pieces of the Wardrobe on the morning of May 23, 2012. Tr. 804-805.

8.  The plaintiff never completed the hanging of the Wardrobe doors on the Wardrobe. As of Tuesday, May 29, 2012, the wardrobe assembly was complete except that the doors were not hung. Tr. 819, 842. On Tuesday, May 29, 2012, Mr. Adira asked P.G. Gustafsson, the Ambassador's chef, to help Mr. Adira hang the doors on the Wardrobe, and they attempted to do so together in the third floor master bedroom. Tr. 819-820, 842. Mr. Adira and Mr. Gustafsson were unsuccessful in hanging the doors, Tr. 842, and it was not until the Wardrobe was moved to the second floor that Mr. Adira was successful in hanging the doors with the assistance of superintendent Alban Mustafaj, Tr. 848-849.

9. The plaintiff testified to certain significant facts that have been disproven by witness testimony and documentary evidence, demonstrating reason to discount his credibility in other respects. Most significantly, the plaintiff testified that he saw P.G. Gustafsson, the Ambassador's chef, at 600 Park Avenue on May 23, 24, and 25, 2012. Tr. 347, 685, 689, 692. And the plaintiff specifically recalled that Mr. Gustafsson pointed the plaintiff to the door to the basement where the plaintiff claims that he retrieved a ladder from which he fell while installing the doors to the Wardrobe. But Mr. Gustafsson testified credibly that he was in Sweden during that week. Tr. 816. Mr. Gustafsson left for Sweden from Newark International Airport on May 18, 2012, as demonstrated by his flight itinerary, Tr. 817-818; Def. Exs. 645, 646, to attend a four-day cooking course together with chefs for other Swedish embassies around the world, Tr. 818; Def. Ex. 647, and returned to the United States on May 26, Tr. 817; Def. Ex. 646.

10. While the plaintiff attempted to discredit Mr. Gustafsson's testimony and the records of his trip, Mr. Gustafsson's testimony was wholly credible. It is not credible that Mr. Gustafsson imagined his trip to Sweden or concocted the evidence of that trip. The plaintiff was plainly mistaken in his testimony about Mr. Gustafsson and the circumstances under which

he allegedly obtained a ladder to hang the doors on the Wardrobe.

11. The plaintiff was also not credible when he claimed that he spoke with Inga-Lena Bengtsson about his alleged injury upon his return to work on May 30, 2012, Tr. 247, 248, because the Mission attendance records show that Ms. Bengtsson was absent from work on May 30 and 31, 2012, Def. Ex. 652; see also Def. Ex. 651. At trial, Ms. Bengtsson did not recall when or from whom she heard that Mr. Figueroa had been injured. Tr. 483. She did not testify that the plaintiff reported his injury to her. The Mission was closed on Monday, May 28 for Memorial Day, and Tuesday May 29 was the first business day after the Memorial Day weekend. There are some indications that the plaintiff worked on May 29. The plaintiff's notations in the Driver's Journal, Def. Ex. 619 at PMOS 1508, indicate that the plaintiff drove on that day, Tr. 244. And the plaintiff told Dr. Casden that he returned to work on May 29, 2012, Tr. 897, 938; Pl. Ex. 326. However, other Mission records indicate that the plaintiff was not at work on May 29 and that he reported a work injury. Pl. Exs. 85, 86, 87, 37. There were no witnesses to the plaintiff's alleged work injury and any evidence in the Mission's records came from the plaintiff's own report. At most, the Mission's records support that the plaintiff did not report to work on May 29, that he incorrectly filled out his log book

to indicate that he drove that day, but he reported that he was absent because of a work injury.

12. The plaintiff's testimony that he fell from a ladder while installing the doors to the Wardrobe by himself was not credible because, among other reasons, his descriptions of the ladder and the circumstances of the fall were not consistent or credible. The IKEA instructions for assembling the Wardrobe advise the use of two people for the installation of the Wardrobe's two sliding doors. Def. Ex. 640 at PMOS 0002762. The instructions also advise the two individuals installing the sliding doors to do so while initially standing on the floor. Thereafter, one person would stand on a three-step step stool or small ladder to assure that the door was properly in the track at the top of the door. Def. Ex. 640 at PMOS 0002762.

13. At his deposition, the plaintiff testified that the ladder from which he fell was "a typical construction stepladder [. . .] An A-shaped ladder with kind of a flat top on it." Tr. 559. The plaintiff had sketched a version of the ladder that showed four steps. Tr. 561; Def. Ex. 631. When asked if he was certain about the detail of four steps on his sketch, he said he was. Tr. 561. Yet at trial, the plaintiff stated, "I believe it is the ladder," Tr. 128, with reference to a ladder that he had failed to recognize at his deposition, Tr. 127-128; Pl. Ex. 266, despite the fact that the ladder that he identified did not have

either a flat top or four steps, Pl. Ex. 266. Contrary to the plaintiff's allegations in the First Amended Complaint, Def. Ex. 623 (Dkt. No. 25), the plaintiff was unable to identify a five-foot ladder from which he alleges he fell.

14.    The plaintiff's description of how and why he brought the ladder to the master bedroom is not credible. He claimed that he retrieved the ladder from the basement of 600 Park Avenue, Tr. 563, on the morning of May 23, 2012, Tr. 557, but could not identify where the basement door was located, Tr. 563-564, or in which direction he went to the superintendent's office to get the ladder when he came down the basement stairs, Tr. 564. He claimed that he was told by P.G. Gustafsson, "Go through the doors, just take the stairs downstairs," Tr. 564, which is impossible given that Mr. Gustafsson was in Sweden at the time, Tr. 816.

15.    Further, Anneli Bailey did not recall seeing the ladder identified by the plaintiff as the one from which he might have fallen, Def. Ex. 633, in the master bedroom on the morning of May 23, 2012, or any ladder other than the small two-step ladder that she brought to the third floor to use for hanging curtains, Tr. 807, 808. Similarly, neither Selim Adira nor P.G Gustafsson recalled a ladder in the master bedroom on May 29, 2012, Tr. 854, 820, the first workday following the Memorial Day weekend, although the plaintiff claimed to have

left the ladder and tools he claimed to have retrieved from the basement in the master bedroom when he left the Residence on Friday, May 25, 2012, Tr. 713.

16. The plaintiff's description of how he incurred his alleged injury in attempting to hang the doors is also inconsistent and not credible. At trial, the plaintiff stated that he first tried to hang the Wardrobe doors "from the bottom to the top without using a ladder." Tr. 704. This is inconsistent with his deposition testimony, where he stated that he used a ladder on his first attempt to install the Wardrobe doors. Tr. 705.

17. The plaintiff's description of how he reacted to the alleged injury is similarly incredible. He claimed that he experienced pain at a level seven on a scale of one to ten, Tr. 710, but he did not call for any medical assistance or advise his employer that he had fallen, Tr. 712. Indeed, at his deposition, he claimed that he had not called anyone at all, Tr. 710-711, but on direct examination at trial the plaintiff testified that he called his wife after the fall and before finishing hanging the doors, Tr. 133-134.

18. The defendants were not negligent in connection with the assembly of the Wardrobe. The plaintiff pointed out that the Wardrobe required two people, and the defendants assigned Mr. Adira to work with the plaintiff. If Mr. Adira was not there at

the precise moment when the plaintiff got to the point where the instructions called for two people -- standing on the floor -- to mount the doors, the plaintiff could have and should have waited for him. The plaintiff testified that he saw Mr. Adira at lunchtime on May 25 because Mr. Adira brought lunch for the plaintiff. Tr. 702. But the plaintiff did not ask Mr. Adira to help him hang the doors. The plaintiff never asked Mr. Adira to help him with any part of the assembly on Thursday or Friday May 24 or May 25. Tr. 702-703.

19. The plaintiff claims that Mr. Adira told him he was too busy to help the plaintiff, but that testimony is neither credible nor responsive. The defendants had arranged to have the Wardrobe assembled when both Mr. Adira and the plaintiff were present, and Mr. Adira had sufficient time to get the plaintiff lunch. Moreover, according to the plaintiff, by early afternoon on Friday, May 25, he had completed the assembly of both doors so that all that remained was to hang the doors. Tr. 702-703. But the plaintiff did not ask Mr. Adira to help him with the part of the assembly that the instructions indicated required two people.

20. The plaintiff testified incredibly at trial that he responded to the severe pain that he experienced from the fall by walking down the stairs from the third floor to the first floor to see if Mr. Adira or Mr. Gustafsson were there and then

returning upstairs to the third floor. Tr. 709-710. He did not think to go to the Superintendent's office. He claimed that he then finished hanging the doors on the Wardrobe, Tr. 712, descended the stairs from the third to the first floor again, Tr. 714, and then took his usual bus route home, Tr. 741-742, which was to take the Bronx express bus from a stop at Madison Avenue and 46th Street, Tr. 686, a significant walk from the Residence at Park Avenue and 64th Street.

21. The plaintiff did not seek any medical assistance in the immediate aftermath of his alleged fall. He spent a sedentary Saturday, May 26, and was at home on Sunday, May 27, and on Memorial Day, May 28, he went to a barbecue at his in-laws' home for two or three hours.

22. The records are inconsistent as to whether the plaintiff went to work on May 29, but it is clear that any notations in the Ministry records that the plaintiff should be paid for that day because his absence was "work related" could only have been based on information provided by the plaintiff because his alleged fall was not witnessed by anyone else. Pl. Exs. 85, 86, 87, 37. None of those records provide any details of a fall from a ladder.

23. The plaintiff continued to work regularly for the Mission from June 2012, that is, a standard 40-hour workweek, see Def. Ex. 650 at PMOS 0001553. In addition to his regular

schedule, in June 2012, the plaintiff worked 35.5 hours of overtime. Pl. Ex. 32. In July and August 2012, the plaintiff worked 15 hours of overtime. Pl. Ex. 32. In September 2012, the plaintiff worked 78.5 hours of overtime. Pl. Ex. 32. In October 2012, the plaintiff worked 36.5 hours of overtime. Pl. Ex. 32. In November 2012, the plaintiff worked 28.5 hours of overtime. Pl. Ex. 32. In December, the plaintiff worked 13 hours of overtime, Pl. Ex. 32, before he took his first medical leave of absence, which began on December 18, 2012. Def. Ex. 650 at PMOS 0001515.

24. The plaintiff admitted that he did not seek medical attention related to the alleged fall or any pain he was experiencing in June, July, or August 2012. Tr. 146. He alleges that he did not do so because he was waiting to hear from the Mission before doing so, but that explanation is not credible if the plaintiff was encountering significant pain. It is also inconsistent with his overtime record at the time. When the plaintiff did call in September 2012 to make an appointment with Dr. Rose for October 5, 2012, he still had not heard back from the Mission's administration. Tr. 149.

### C. The Plaintiff's Pre-Existing Medical Conditions

25. The plaintiff had substantial pre-existing medical conditions prior to May, 2012. The plaintiff has failed to prove that anything that happened to him on May 25, 2012 was the

proximate cause of any damage to him or the exacerbation of his pre-existing conditions.

26. The plaintiff was involved in a car accident on or about March 8, 1997 that caused him back injuries. Def. Ex. 678 at MED 000563. MRIs taken of the plaintiff's lumbar spine within a few months of his 1997 car accident showed a disc bulge at L4-L5. Def. Ex. 678 at MED 000568. At that time, the plaintiff suffered from daily lower back pain that radiated down into both legs. Def. Ex. 678 at MED 000563. The plaintiff continued to suffer from lower back pain for which he sought medical treatment in 1997 and in years subsequent to 1997. See, e.g., Pl. Ex. 60 at MED 000015, MED 000072.

27. On October 29, 2010, the plaintiff saw an orthopedist, Dr. Louis C. Rose, concerning his lower back and leg pain. Dr. Rose noted that there was a preexisting condition and that the symptoms and condition were worsening. Def. Ex. 674 at MED 000533-34. Dr. Rose also noted that the plaintiff engaged in weightlifting. Def. Ex. 674 at MED 000533. Dr. Rose referred the plaintiff for an MRI of the plaintiff's lumbar spine. Def. Ex. 674 at MED 000542. The MRIs taken on November 17, 2010 showed the disc bulge at L4-L5 that first appeared on the 1997 MRIs, and the report noted foraminal narrowing that caused compression on a nerve root. Def. Ex. 674 at MED 000542. The plaintiff was

advised: "No pushing, pulling, or lifting." Def. Ex. 674 at MED
000537.

28. In 2010 or earlier, the plaintiff also informed his
co-workers at the Mission that he suffered from back and leg
pain. Tr. 760, 790, 815-816, 835. As a result of his leg and
back pain, prior to May 2012 the plaintiff often stood while
working in the office or sat on a pillow on his chair. Tr. 760,
790. The plaintiff's physician noted that his back and leg pain
was exacerbated by prolonged sitting and driving. Def. Ex. 674
at MED 000536 (December 22, 2010). In January 2012, the
plaintiff's primary care physician noted that the plaintiff
"refused Pain manegent [sic]" for his chronic lower back pain
and refused orthopedic follow-up for the same. Pl. Ex. 60 at MED
000093-94.

### D. Events and Medical Treatment After May 2012

29. In September 2012, the month of the opening of the
United Nations General Assembly, Tr. 722, the plaintiff worked
78.5 hours of overtime, more than during any other month during
the year, Tr. 147-148; Pl. Ex. 32. On October 5, 2012, the
plaintiff again saw Dr. Rose with complaints of lower back pain
radiating down into both legs. Def. Ex. 674 at MED 000539. Dr.
Rose observed that the plaintiff's "[s]ymptoms are unchanged,"
and that the "symptoms are constant." Def. Ex. 674 at MED
000539-40. Dr. Rose also noted that the plaintiff engages in

15

weightlifting, Def. Ex. 674 at MED 000539-40, and instructed him

to stop pushing, pulling, and lifting, Def. Ex. 674 at MED

000540. This back and leg pain worsened in December 2012,

causing the plaintiff to be treated in the Weiler Hospital

Emergency Room on December 14-15, 2012, where it was noted that

the pain he complained of had begun two years earlier. Def. Ex.

668 at MED 000387.

    30.   The plaintiff began a medical leave of absence from

the Mission on or about December 18, 2012. Def. Ex. 650 at PMOS

0001515. The plaintiff informed medical providers who treated

him in December 2012, in 2013, and in 2014, that he had

experienced the pain that caused him to go to the hospital in

December 2012, and that caused him to seek their medical care

and to undergo a laminectomy in 2013, since at least 2010. Def.

Ex. 668 at MED 000450 ("complaining of 2-1/2 years of leg pain"

in December 2012); Def. Ex. 668 at MED 000446 ("He states that

he has had this for many years now" on January 29, 2013); Def.

Ex. 712 at MED 001439 ("Pt stated gradual onset of Low back pain

3 yrs ago, progressively increasing from last 4 months" on

February 7, 2013); Pl. Ex. 164 at MED 000663 ("He reports that

this pain started 3 years ago leading to surgery one year ago"

on August 4, 2014); Pl. Ex. 177 at MED 001139 ("When did the

injury occur or symptoms begin? 4 YEARS AGO" on November 6,

2014); Pl. Ex. 177 at MED 001167 ("He began experiencing this pain about four years ago" on November 7, 2014).

31. The plaintiff did not experience significant back pain as the result of the alleged fall on May 25, 2012, as demonstrated by his choice not to seek medical attention for a period of months thereafter. Tr. 146. The plaintiff did not prove that his alleged fall on May 25, 2012 caused any medical condition that has produced any pain or that exacerbated any pre-existing medical condition. No medical evidence was presented that demonstrated a causal link between any demonstrable injuries and the alleged fall of May 2012.

32. The defendants' medical expert, Dr. Andrew Casden, the chief of Orthopedics and Spine Surgery in the Department of Orthopedics at White Plains Hospital, testified persuasively that there were no clinically significant changes in the plaintiff's lumbar spine as reflected in the November, 2010 MRI and the January, 2013 MRI, and that there were no clinically significant changes that could be attributed to a traumatic event such as the fall that the plaintiff alleged occurred on May 25, 2012. Tr. 900-901. There was no structural spine or lumbar damage that did not exist in 2010. Def. Ex. 600, Report of Dr. Andrew Casden at 6; Tr. 904-906. There was no scar tissue evident in or near the plaintiff's sciatic nerve or piriformis muscle that could be sourced to the alleged fall. Tr. 680.

33. MRIs of the plaintiff's spine taken in January 2013 show essentially no change from the injuries that the plaintiff had as of November 2010, demonstrating that the plaintiff's preexisting back condition was neither caused nor aggravated by the alleged fall of May 25, 2012. See Def. Ex. 694-697 (MED 001189); Def. Ex. 698-701 (MED 000996); Def. Ex. 600, Report of Dr. Andrew Casden at 6; Tr. 904-906. Even if the plaintiff's current pain were the result of damage to his sciatic nerve, which has not been proven, the plaintiff's treating physician stated that it is possible to damage one's sciatic nerve by lifting luggage or comparable things. Tr. 679. The plaintiff cannot link his current pain with the alleged May 2012 fall.

34. The back pain for which the plaintiff sought medical treatment in October and December 2012 and afterwards was not caused by the alleged fall of May 25, 2012, as demonstrated by Mrs. Figueroa's statement, "at first we weren't even thinking that the fall had anything to do with it, but then we started to think what had happened that's different." Tr. 57. The plaintiff specifically denied to his medical providers that the pain resulted from a particular accident or trauma. Def. Ex. 662 at MED 000290. In 2014, the plaintiff wrote on an intake questionnaire for the Hospital for Special Surgery that his pain began "4 YEARS AGO" from "WORK SITTING." Pl. Ex. 184 at MED 001137. Months later, his doctor concluded: "The working

18

diagnosis for his pain is sciatic nerve entrapment secondary to prolonged sitting when he was working as a driver," not that the pain resulted from a fall or other trauma. Def. Ex. 680 at MED 000618 (April 24, 2015).

35. While the plaintiff was out on sick leave, he received 80% or 75% of regular pay in accordance with the defendants' practice. If the plaintiff's leave was occasioned by a work related injury, he would have been entitled to 100% of his compensation. There is no indication in the record that the plaintiff ever sought to receive 100% of his pay. Tr. 761-762; Def. Ex. 650 at PMOS 0001590-92.

36. The plaintiff also has not demonstrated that he suffers from Post-Traumatic Stress Disorder, Tr. 966-967, a general anxiety disorder, Tr. 969, or any other diagnosable psychological disorder that was caused or exacerbated by an alleged May 2012 traumatic event, Tr. 967, 984-986.

### E. There Was No Compulsion

37. The plaintiff has alleged that he was forced to construct the Wardrobe by himself, but that testimony was not credible. The plaintiff had a history of speaking his mind when he disagreed with directives from either the Ambassador or the Head of Chancery. In September 2010, the plaintiff rejected Ambassador Grunditz' suggestion of a flat rate of pay, Tr. 96-97, and suffered no adverse employment action because of this

refusal. He continued to receive pay increases over the
following years. Tr. 637, 762, including during two years when
he was on extended leave of absence. Tr. 763. When Ms. Zinfandel
asked the plaintiff to pick up the Wardrobe from IKEA, he
refused, stating that he could not do it alone. Tr. 114-16, 117.
His opinion was respected, and the items were ordered to be
delivered to the Residence. Tr. 117; see also Pl. Ex. 63.
Similarly, when the plaintiff was asked to assemble the
Wardrobe, the plaintiff told both the Head of Chancery and the
Ambassador that he would need assistance, and the Ambassador
assured the plaintiff that the plaintiff would have another
employee work with him. Tr. 339-340.

38.   The plaintiff's claim that he was directed by the
Ambassador to complete the assembly of the Wardrobe by the end
of the day on May 25, 2012, Tr. 124-125, is not credible. At his
deposition, the plaintiff did not testify to that comment and he
testified that the entirety of his conversation with the
ambassador and Ms. Zinfandel consisted of the Ambassador's
telling him that he was doing a good job, without any mention of
a deadline to complete the assembly. Tr. 697. At trial, the
plaintiff testified that he did not object to the Ambassador's
alleged instruction that the plaintiff finish the Wardrobe
before the weekend. He did not tell the Ambassador that it would
be impossible to complete the job or that he was not receiving

proper assistance. Tr. 125. The plaintiff had the Ambassador's cell phone number. Tr. 224. The plaintiff and the Ambassador often communicated directly with one another about the plaintiff's assignments. Tr. 224. Yet the plaintiff did not alert the Ambassador to what he alleged was an unsafe work condition. Tr. 122.

39. While the plaintiff alleged that he feared for his job if he did not proceed to attempt to construct the Wardrobe by himself, that testimony was not credible. The plaintiff was given a copy of the Mission's Terms and Conditions in English. Tr. 725; see also Def. Ex. 648. Mission staff testified that no one -- not even the Ambassador -- could terminate the employment of a Mission employee without following the multi-step protocol set forth in the Terms and Conditions. Tr. 490-491. Section 18 of the Terms and Conditions in effect in 2012 states that an employee may be given notice of dismissal only "if the employer has objective grounds for dismissal." Def. Ex. 648 at PMOS 0001631. Section 18 states: "If an employee has been given three written cautions within two years, the third caution constitutes ground for dismissal." Def. Ex. 648 at PMOS 0001631. By May 2012, the plaintiff would have been entitled to four months of notice prior to dismissal in the event that the Ambassador did find objective grounds for dismissal. Def. Ex. 648 at PMOS 0001632. Prior to May 25, 2012, the plaintiff had never received

any written discipline or cautions from the Mission. Tr. 715. The plaintiff had no justifiable reason to fear that his employment would be terminated.

40. The plaintiff appears to have exaggerated his current condition in ways that undercut his credibility. The defendants took surreptitious surveillance videos of the plaintiff engaged in various activities of daily living including washing his car and walking to and from his house. Those videos are inconsistent with the plaintiff's description of his limitations. In fact, Dr. Casden testified that the video showing the plaintiff carrying a duffle bag slung over his shoulder while holding a pet carrier with a pet kitten in it in one hand and his cane (not in use) in the other exceeded normal activities of daily living. Tr. 913-914; Def. Ex. 711; see Tr. 736.

41. The plaintiff provided the Mission with no fewer than nine letters from four different physicians during the course of his partially paid leave of absence, all of which indicated that his absence was temporary and that he was expected to return to work within relatively short periods of time. Def. Ex. 650 at PMOS 0001528, 0001530, 0001532, 0001533, 0001535, 0001537, 0001539; Pl. Ex. 188 at PMOS 0002082; Pl. Ex. 200 at PMOS 0002083.

## II. CONCLUSIONS OF LAW

1. This court has jurisdiction over this action pursuant to 28 U.S.C. § 1330(a) and the Foreign Sovereign Immunities Act, 28 U.S.C. §1605(a)(5) (the "FSIA"). Under the FSIA, a tort that is alleged to have occurred in New York is controlled by New York common law. See Robinson v. Government of Malaysia, 269 F.3d 133, 142 (2d Cir. 2001).

2. To prevail on a negligence claim under New York law, a plaintiff must satisfy three elements by a preponderance of the evidence: (1) a duty owed to the plaintiff by the defendant; (2) breach of that duty; and (3) injury substantially caused by that breach. See, e.g., Lombard v. Booz-Allen & Hamilton, Inc., 280 F.3d 209, 215 (2d Cir. 2002). The defendants at all relevant times fulfilled their common law duty by providing the plaintiff with a safe workplace, see Gasper v. Ford Motor Co., 192 N.E.2d 163, 166 (N.Y. 1963), and did not unreasonably expose the plaintiff to any unreasonable risk of harm that was a substantial cause of any injury. No policy adopted by the Mission, whether based on foreign law or otherwise, may be used to impose a heightened standard of care against the Mission than that required by the law in New York. See, e.g., Rivera v. N.Y.C. Tr. Auth., 569 N.E.2d 432, 435 (N.Y. 1991); Gilson v. Metropolitan Opera, 841 N.E.2d 747, 749 (N.Y. 2005). The only standard of care applicable is the common law of negligence.

3.     The defendants acted reasonably at all relevant times
in assigning work duties to the plaintiff and others. A
defendant is negligent when it breaches the duty of care imposed
by law by engaging in conduct posing an unreasonable risk of
harm to others.

> The primary factors to be taken into account in
> assessing the reasonableness of a defendant's conduct
> are: the foreseeable likelihood that it will result in
> harm, the foreseeable severity of the harm that may
> ensue and the burden that would be borne by the actor
> and others if the actor takes precautions that
> eliminate or reduce the possibility of harm.

Craig Test Boring Co., Inc. v. Saudi Arabian Airlines Corp., 138
F. Supp. 2d 553, 557 (S.D.N.Y. 2001) (quoting Palka v.
Servicemaster Mgmt. Servs. Corp., 634 N.E.2d 189, 193 (N.Y.
1994)). When considering these factors, it is clear that the
Mission did not act in a manner that foreseeably exposed the
plaintiff to an unreasonable risk of harm or injury by assigning
him duties in connection with assembling furniture manufactured
and sold expressly for assembly and use by laypeople without any
specialized training or expertise.

4.     The plaintiff was in no sense required to perform his
job in an unreasonable or unsafe manner. No one instructed him
to ignore the instructions provided with the Wardrobe or to use
a ladder alone; those were his choices alone. Cf. Lombas v.
Moran Towing & Transp. Co., Inc., 899 F. Supp. 1089, 1095
(S.D.N.Y. 1995). "When a workman confronts the ordinary and

obvious" and has the means, including the time, to proceed
safely, he may not hold others liable "if he elects to perform
his job so incautiously as to injure himself." Abbadessa v.
Ulrik Holding Ltd., 664 N.Y.S.2d 620, 621 (App. Div. 1997). The
plaintiff has not proven that he fell from a ladder on May 25,
2012, or even that he fell at all. To the extent that he fell,
there is no evidence that the fall (whatever it may have been)
was caused by any negligence of the defendants. Any injury that
the plaintiff suffered was caused solely by his own negligence.

5.    The theory of inherent compulsion is not applicable as
a means of shielding the plaintiff from the fact that he assumed
the risk of using a ladder alone. The plaintiff offered no
evidence that he had no choice but to engage in the evident risk
of using a ladder alone or that any superior directed him to do
so. See, e.g., Maddox v. City of N.Y., 487 N.E.2d 553, 557-558
(N.Y. 1985). Two factors are generally required to sustain a
finding of liability on an inherent compulsion theory despite
the plaintiff's knowledge of the risk: "a direction by a
superior to do the act" despite dangers known by the superior
and "an economic compulsion or other circumstance which equally
impels" compliance with the superior's direction. Benitez v.
N.Y.C. Bd. of Educ., 541 N.E.2d 29, 33 (N.Y. 1989) (internal
citation omitted). The plaintiff cannot demonstrate either that
he was directed to complete the assembly of the Wardrobe alone,

or to use any particular means to hang the Wardrobe's doors, or that he had any reason to believe that he would suffer any significant adverse consequence if he was unable to complete the Wardrobe's assembly. Nor did he voice any objection to the apparent conditions under which he attempted to hang the wardrobe's doors on May 25, 2012. Tr. 125.

6. The plaintiff has failed to demonstrate, as required under the inherent compulsion doctrine, that he was faced with (1) a direction in the form of an explicit command requiring him to act in a manner that the employer has actual notice is dangerous, and (2) an economic compulsion which impels compliance. See Benitez, 541 N.E.2d at 33 (finding a plaintiff's general fear that his scholarships would be compromised if he did not play football insufficient to support inherent compulsion); Ticha v. OTB Jeans, 834 N.Y.S.2d 126, 127 (App. Div. 2007) (claim for inherent compulsion failed where the plaintiff had no evidence she complained to her superior when dangers were apparent or that he directed her explicitly to perform an act that would expose her to damage apparent to him).

7. The plaintiff has not proven that the alleged fall of May 25, 2012 was a proximate or substantial cause of any injuries or that it exacerbated any pre-existing injuries. The plaintiff's medical needs that arose months later cannot be attributed to the alleged May 25, 2012 fall. See, e.g.,

Derdiarian v. Felix Contracting Corp., 414 N.E.2d 666, 670 (N.Y. 1980) ("the plaintiff must generally show that the defendant's negligence was a substantial cause of the events which produced the injury"); Winderman v. Brooklyn/McDonald Ave. Shoprite Assocs., Inc., 925 N.Y.2d 637, 639 (App. Div. 2011). The plaintiff's failure to seek contemporaneous medical attention, his subsequent work schedule, see Pl. Ex. 32, and the absence of any clinically significant changes in the plaintiff's lumbar spine in January 2013 that could be attributed to a traumatic event in May, 2012, among other facts, demonstrate that the medical needs that arose months later cannot be attributed to the alleged fall on May 25, 2012.

## CONCLUSION

The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, they are either moot or without merit. Because the plaintiff has failed to prove by a preponderance of the evidence that he is entitled to any relief, the Clerk is directed to enter judgment **dismissing** the Second Amended Complaint. The Clerk is also directed to **close all pending motions**.


SO ORDERED.

Dated:     New York, New York
           May 3, 2018

                                        John G. Koeltl
                              United States District Judge